AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Northern District of Indiana

- FILED -

MAR 25 2014

At _____ M
ROBERT N. TRGOVICH, Clerk
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| | ) Case No. | |
| | ) | 2:14 MJ 28 |
| WILLIAM CANTRELL | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   Jan 1, 2010 thru March 20, 2014   in the county of            Porter            in the
   Northern      District of      Indiana      , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, U. S. C., §1343 | Having devised or intended to devise a scheme or artifice to defraud, or by obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitting or causing to be transmitted by means of wire communication in interstate commerce, any writings, signs, signals, pictures or sounds for the purpose of executing such scheme or artifice. |
| Title 18 U.S.C., §2261A(1) | Interstate Stalking. |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

_____
*Complainant's signature*

ERIC FIELD, Special Agent/FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   03/25/2014

S/Paul R. Cherry
*Judge's signature*

City and state:      Hammond, Indiana           PAUL R. CHERRY, U. S. MAGISTRATE JUDGE
*Printed name and title*

## AFFIDAVIT

I, Eric Robert Field, being duly sworn on oath, hereby state as follows:

## INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since 2009. I have been assigned to the Merrillville Resident Agency of the FBI for my entire career. I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered to investigate and make arrests for violations of U.S. criminal laws. I am assigned to investigate white collar crime, and I have been involved in mortgage fraud, public corruption and theft of federal funds investigations and have participated in the use of various investigative techniques in those cases. As such, I have gained experience in conducting investigations involving violations of Title 18, United States Code, Section 1343 (Wire Fraud), among other statutes. Previous to my service with the FBI, I worked as a Certified Public Accountant and Certified Fraud Examiner in the audit sector of public accounting.

2. As a Special Agent my responsibilities include investigating possible criminal violations of federal laws. I have been involved in the preparation of indictments, search warrants, I have testified in federal court and in front of the Grand Jury.

3. What follows are the facts that I believe are necessary to establish probable cause for the issuance of a criminal complaint alleging that William Cantrell violated Title 18, United States Code, Section 1343 by, having devised or intended to devise a scheme or artifice to defraud, or by obtaining money or property using means of false or fraudulent

1

pretenses, representations, or promises, transmitting or causing to be transmitted by means of wire communication in interstate commerce, any writings, signs, signals, pictures or sounds for the purpose of executing such scheme or artifice, Title 18 U.S.C. §2216A(1) Stalking.

4. The facts set forth herein are either personally known to me or have been told to me directly by law enforcement officers and others with whom I have worked on this case. I have not included in this affidavit each and every fact known to me concerning this investigation.

## INVESTIGATION

5. On October 23, 2013, I was assigned the investigation of William Cantrell (herein after also referred to as "Cantrell") and his involvement with The Dragon Fund, L.P. The Dragon Fund was a registered company with the Indiana Secretary of State's Office, with a business address in Valparaiso, Indiana. The investigation was initiated based on information obtained from a Civil Lawsuit filed by M.S. On paper, The Dragon Fund appeared to be a legitimate private hedge fund, operated by Cantrell. However, I learned through my investigation that the Dragon Fund was not a registered or legitimate hedge fund.

## GENERAL SCHEME

6. M.S was introduced to Cantrell during 2010. Cantrell induced M.S. into investing money into the Dragon Fund, by providing false information about the number of investors currently in the Dragon Fund. He also provided false information based on what type of investments were maintained within the Dragon Fund. Cantrell explained to M.S.

the different type of investment styles, such as "call options" and "put options." Cantrell explained to M.S. that the other investors had earned a good rate of return, and her rate of return would be dependent upon the amount of money she actually invested. Cantrell assured M.S. that the Dragon Fund was a safe investment with a good rate of return. Cantrell made M.S. believe that he was employed by large corporations to manage their pension funds.

7. On or about December 14, 2010, M.S. invested $316,074.20 of her money into the Dragon Fund. M.S. was able to withdraw the funds from an existing account she had with Fidelity Investments. These funds were known as M.S. Trust within the Dragon Fund.

8. On or about January 5, 2011, M.S. invested $431,141.82 of her money into the Dragon Fund. M.S. withdrew these funds from an Individual Retirement Account (IRA) that she held with Fidelity Investments. These funds were known as M.S. IRA, but were still controlled by Cantrell.

9. Cantrell set M.S. up with an account at Self Directed IRA Services, an independent administrator of IRA accounts.

10. On or about February 10, 2011, M.S invested her remaining assets, which totaled approximately $65,860. This final transfer came into the control of Cantrell through Options Xpress. M.S. initially wanted these investments to remain as stocks. She did not want them invested within the Dragon Fund.

11. For the time period of January 1, 2011 through December 31, 2012, Cantrell sent M.S. quarterly statements of her M.S Trust Account. For the time period ending

December 31, 2012, the quarterly statements provided to M.S. from Cantrell showed a net increase of her investment of $47,623.

12. During 2012, Cantrell had made bad investment decisions with M.S.'s $65,860 investment. The remaining balance was approximately $40,000. Cantrell convinced M.S. that since her investment within the Dragon Fund had earned a good rate of return, she should transfer the remaining $40,000 into the control of the Dragon Fund. On or about August 20, 2012, M.S. agreed to transfer her remaining $40,000 into the Dragon Fund, to be part of the M.S. Trust.

13. The final M.S. Trust statement provided to M.S. from Cantrell showed a net gain on her investment of $94,720.01.

14. Cantrell promised M.S. that he would provide $60,000 of his own money into the M.S. Trust, because he felt bad that he had lost some of her previous stock investment. Future M.S. Trust statements showed the $60,000 contribution from Cantrell. However, it is not believed that any such transfer was made, as the quarterly statements were false.

15. M.S. also received statements for her M.S. IRA investments. These statements were provided and maintained by Self Directed IRA Services. However, Cantrell provided Self Directed IRA Services with the value of the account. Beginning in 2012, Cantrell himself began to provide M.S. with copies of the M.S. IRA quarterly statements. The December 31, 2012 M.S IRA quarterly statement showed a net gain of $68,916.

16. During March 2013, M.S. wanted to utilize the gains on her investment to purchase a home for her mother. On or about April 22, 2013, M.S. requested a $120,000 distribution from her M.S. Trust Account. The request was in writing. Cantrell informed

M.S. that he would not be able to get her a distribution until the end of the quarter (June 2013). M.S. and her mother purchased the home during April 2013, using other investments. They purchased the home with the intention to "reimburse" their other investments with the distribution from the M.S Trust Account.

17.     All of the proper paperwork was completed by M.S. for the distribution prior to the end of the quarter. Cantrell informed M.S. that a wire transfer would be made on June 28, 2013. However, prior to June 28, 2013 Cantrell informed M.S. that the distribution would be delayed until July 5, 2013. Cantrell later informed M.S that the wire transfer was delayed again, with an expected delivery date of July 12, 2013. M.S. contacted Cantrell on or about July 15, 2013 to inquire about her distribution. Cantrell indicated that he was having issues with the distribution and asked if M.S. would accept a cashier's check in the amount of $125,000. He informed M.S. that he would overnight the check.

18.     On or about July 18, 2013, M.S. received a package from Cantrell. The package contained a stock quote, which had nothing to do with M.S.'s investment. M.S. reached out to Cantrell. Cantrell informed her that he had sent out two packages, but to the wrong people. He indicated that the other person had already sent the cashier's check back to him.

19.     M.S. questioned Cantrell about the validity of what he was saying. Cantrell told M.S. that the Dragon Fund had no money, and the money had been gone since January 2011. Cantrell informed her that the quarterly statements she had received for her M.S. Trust Account and her M.S. IRA were false.

20.     On or about July 19, 2013, M.S. received a package from the United States Postal Service containing a blank piece of paper. The package M.S. received was supposed

to have contained the $125,000 cashier's check. The package was sent by, or at the direction of Cantrell.

## VICTIM #2

21. I first spoke with J.L in December 2013. She indicated that she had met Cantrell through her friend, M.S. J.L invested $80,000 with Cantrell in one lump sum payment. The investment occurred in approximately February 2012. The money was to be invested in the Dragon Fund. M.S. shared her Cantrell experience with J.L. As a result, J.L became worried for her investment. She had always received quarterly statements from Cantrell, and she therefore believed her investment was doing well. J.L's quarterly statements showed a net gain on her investment.

22. In either September 2013 or October 2013, J.L requested a $50,000 distribution from Cantrell as a result of the story M.S. had told her. Cantrell informed her that she would have to wait until the end of the quarter in order to receive her money. Cantrell told his clients he was not able to withdraw money from the Dragon Fund during a quarter. He promised J.L. that she would have her distribution by January 15, 2014.

23. J.L had told Cantrell that she planned to use the money to help her daughter purchase a home.

24. J.L's September 2013 quarterly statement showed she had more than $100,000 invested within the Dragon Fund. Cantrell had inquired of J.L. why she did not take the money out of one of her other investments. J.L explained that for tax reasons she wanted it removed from the Dragon Fund.

25. As January 15, 2014 approached, J.L. stayed in contact with Cantrell via email. Cantrell gave J.L. reasons as to why he was not able to provide her requested distribution.

26. During March 2014, J.L had a telephone conversation with Cantrell. Cantrell explained to J.L that the FBI was investigating him, and they had frozen his assets. The fact that his assets were frozen was the reason why he was not able to provide her with her money.

## OTHER VICTIMS

27. I have spoken with other individuals who had invested money in Cantrell's Dragon Fund. All of the individuals received quarterly statements showing a gain on their investments. One of the individuals had come down with an illness and requested a withdrawal of her funds. That individual received a full return of her principal investment, just none of the earnings. The other individuals had invested with Cantrell for long term and trusted that their quarterly statements were accurate.

## FINANCIAL ANALYSIS

28. Through an analysis of Cantrell's bank account, titled "The Dragon Fund LP," for the time period of January 1, 2010 through November 20, 2013, it appears that deposits totaling $1,081,199.52 came from investors. There were multiple transfers of money with Options Xpress which resulted in a net change of a positive $59,100.18. The disbursements to Option Xpress totaled $781,142.82, and the deposits totaled $840,243. The other significant withdrawals from the account were transfers to Cantrell's personal account totaling $831,271.90. Cantrell's personal account was held at the same financial institution.

There were cash withdrawals which totaled $234,579.80, an average of approximately $5,000 a month.

29. An analysis was completed of Cantrell's personal bank for the time period of December 29, 2009 through November 30, 2013. The two largest categories of deposits were transfers from The Dragon Fund L.P. in the amount of $831,271.90, and cash deposits totaling $76,065. Withdrawals were made as follows: $334,045.43 to various casinos; $169,100.57 in cash withdrawals; $160,779.45 in general living expenses; and $66,000 to Options Xpress. There was also multiple transactions with investors, resulting in net withdrawal of $42,851.

30. As of September 30, 2012, The Dragon Fund L.P. bank account had a balance of $20.62. As of September 27, 2013, Cantrell's personal bank account had a balance of $47.16.

## STALKING

31. As a result of the financial loss, M.S. has filed a civil lawsuit against Cantrell. Cantrell has failed to appear at more than one hearing in this federal civil lawsuit, in the courtroom of the Honorable Judge Phillip Simon, Northern District of Indiana.

32. Cantrell had been instructed by M.S.'s civil attorneys not to have contact with M.S, advising him that she did not want to communicate with him. In the late evening of March 18, 2014 or the early morning of March 19, 2014, Cantrell travelled to M.S's residence located in the State of California. Cantrell resides in the State of Indiana. With the use of a crow bar, Cantrell attempted to gain entrance into M.S.'s residence, removing a window screen, without her permission. Cantrell was not able to gain entrance into M.S's

residence. The Sheriff's Department was contacted, and Cantrell was "passed out" on M.S.s porch when they arrived. Cantrell was arrested and the arresting officers found a knife and a pair of gloves within his possession. No vehicle was identified to be Cantrell's. On March 21, 2014 Cantrell was formally charged with Residential Burglary and Stalking and Possession of a Concealed Dirk/Dagger.

33. The visit to M.S's house caused significant emotional distress to M.S. Through communication with M.S.'s attorney, it appears that M.S. has become very worried that Cantrell would cause serious physical harm to her person. She is concerned that if Cantrell is released from prison, he would attempt to harm her again.

34. Cantrell has used email to communicate with multiple individuals related to the Dragon Fund.

35. I spoke with Cantrell on March 21, 2014. Cantrell indicated that he had multiple investors within the Dragon Fund. The Dragon Fund had very little to no money remaining. The money had been lost in the following ways: actually lost in the market; payouts to some investors; money transferred to Cantrell's personal account for his services; large amount of money improperly transferred to Cantrell's personal account; money improperly withdrawn by Cantrell to gamble with at the casinos. Cantrell stated the quarterly statements he had sent to his investors were false. The statements falsely showed the investors that their principal balance was intact, and they had a good rate of return. These statements were sent out when the Dragon Fund did not have any money left.

## ADDITIONAL INFORMATION

36. Subsequent to the civil lawsuit, but prior to Cantrell appearing at M.S. residence in March 2014, Cantrell sent multiple emails and letters to M.S.'s employer. It appeared that his intention was to discredited M.S. and potentially get her fired. Cantrell explained that he was working with the Internal Revenue Service (IRS) to investigative M.S.'s employer. He told the employer that she was in trouble. Once the IRS contacted M.S. M.S. would save herself rather than help out the employer.

37. Cantrell told the employer that M.S. divulged confidential client information to him. He explained that M.S. should be fired based on the information she had told him. He requested that the employer post M.S.'s firing on Facebook.

## SUMMARY

38. The purpose of Cantrell's scheme was to defraud investors out of large amounts of money, often times the investor's life savings and retirement accounts. He promised these individuals a generous rate of return, and he kept up his fraud by providing false quarterly statements to each investor showing a very good rate of return. All investors were happy with their investment, as they believed they were earning a lot of money. Cantrell provided these statements to the investors when there was little money left in the Dragon Fund. When the scheme began to unravel, and following the filing of a federal civil lawsuit, Cantrell began a campaign of emailing M.S.'s boss in an attempt to discredit her, causing her substantial emotional distress, and finally travelled from the State of Indiana to the State of California, and attempted to break into M.S's home, while

possessing gloves and a knife, the result of which caused M.S. to be placed in fear of serious bodily injury or death.

## PROBABLE CAUSE

39. Based on the above facts, I believe probable cause exists for the issuance of a federal criminal complaint alleging that between on or about January 1, 2010 and March 20, 2014, Cantrell violated Title 18, United States Code, Section 1343 by, having devised or intended to devise a scheme or artifice to defraud, or by obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitting or causing to be transmitted by means of wire communication in interstate commerce, any writings, signs, signals, pictures or sounds for the purpose of executing such scheme or artifice, Title 18 U.S.C. §2261A(1) Stalking.

40. I therefore respectfully request that the attached warrant be issued authorizing said complaint.

FURTHER AFFIANT SAYETH NAUGHT.

_____
ERIC ROBERT FIELD
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me this
**MAR 2 5 2014**

_____S/Paul R. Cherry_____
United States Magistrate Judge
Northern District of Indiana

11